1                UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF MISSOURI
2                     WESTERN DIVISION

3

UNITED STATES OF AMERICA,      )  Case No. 4:16-CR-00301-DGK-1
4                              )
          Plaintiff,           )
5                              )
VS.                            )
6                              )
KEITH L. CARNES,               )
7                              )  September 30, 2020
          Defendant.           )  Kansas City, Missouri
8

9        *******************************************

10              TRANSCRIPT OF SENTENCING
                  BEFORE GREG KAYS
11            UNITED STATES DISTRICT JUDGE

12       *******************************************

13

APPEARANCES:
14

For United States:       Trey Alford
15                        U.S. Attorney's Office
                          400 East Ninth Street
16                        Suite 5510
                          Kansas City, Missouri  64106
17

For Defendant:           Jonathan D. Truesdale
18  [Defendant present.]  Jonathan D. Truesdale, LLC
                          104 West 9th Street
19                        Suite 401
                          Kansas City, Missouri 64105
20

21
                 Regina A. Lambrecht, RDR, CRR
22                   Official Court Reporter
                 400 East 9th Street, Room 8652
23                   Kansas City, MO  64106
                        816.512.5623
24

Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

1                          I N D E X

2    Reporter Certificate - Page 67

3
     UNSWORN WITNESS STATEMENTS:
4
     JACQUELINE CANON MERCER - Page 33
5    PATRICK KELLY MERCER - Page 39

6

7    EXHIBITS ADMITTED:

8    Government Exhibit 1 - Page 26
     Government Exhibit 2 - Page 27
9    Government Exhibit 3 - Page 31
     Government Exhibit 4 - Page 44
10   Government Exhibit 5 - Page 44

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Begin proceedings in open court at 9:31 a.m.)

2                THE COURT:  Mr. Carnes, would you please take --

3                THE DEFENDANT:  (Indiscernible.)

4                THE COURT:  Would you please put your mic -- your

5    face mask on for us?

6                THE DEFENDANT:  Why do I got to put my mask on?  Why

7    do I got -- they already (indiscernible).

8                THE REPORTER:  I can't hear him.

9                THE COURT:  Hold on.  This is Case 16-264-01, *United*

10   *States of America versus Keith L. Carnes.*

11               Mr. Carnes, we're requiring people to wearing masks

12   if they don't have plexiglass in front of them.  So I have

13   plexiglass.  I don't have a mask on right now.  We require you

14   to put a mask on.  Will you do that for us?

15               THE DEFENDANT:  Put a mask on?

16               THE COURT:  You have a mask hanging on your right

17   ear.

18               THE DEFENDANT:  I'm not wearing a mask.  What do I

19   need to wear a mask for?

20               THE COURT:  If you don't wear a mask we're going to

21   remove you from the courtroom, Mr. Carnes.

22               THE DEFENDANT:  Put a mask on, sir?  That's crazy.

23   I don't have a problem, you know what I'm saying?  This Corona

24   stuff.  I got Corona stuff.  I don't have any problems with

25   this stuff.  You know, like I'm having you -- know what I'm

1   saying?

2              THE COURT:  Thank you.

3              I note that Mr. Carnes has put his mask on.

4              Thank you, Mr. Carnes.

5              This case is called today for a sentencing hearing.

6   Mr. Carnes appears here today with his attorney in this case,

7   Mr. Jonathan Truesdale.  Also appearing today is Assistant

8   United States Attorney, Mr. Trey Alford.  Also appearing today

9   is Detective Rorabaugh from the Kansas City, Missouri Police

10  Department.  Also appearing today at counsel table is

11  Ms. Susanne Holland, our paralegal for the U.S. Attorney's

12  office.  Also appearing today is United States probation

13  officer, Mr. Kurt Habiger.

14             This case is called today, as I said, for a

15  sentencing hearing.

16             Mr. Carnes, his case was tried to a jury.

17             THE DEFENDANT:  I'm trying to get -- I got these

18  handcuffs on and (indiscernible) I -- I --

19             THE COURT:  Hold on.  Hold on.  Mr. Carnes, you must

20  be quiet until I ask you to talk.  Otherwise you got to leave.

21  Please have a seat.  I expect the marshals to tell you when

22  you can stand or not stand.

23             THE DEFENDANT:  All right.

24             THE COURT:  Mr. Carnes, the marshals are in charge

25  of security in the courtroom.  I defer to their expertise.

1   Please listen to them and be respectful.  Mr. Carnes, you have

2   your hand up.  What is it you want --

3           THE DEFENDANT:  I ask, Kays, I've not been no

4   problems in the courtroom.  I --

5           THE REPORTER:  Excuse me.  Can we move the

6   microphone?

7           THE COURT:  Hold on.  Can we move a microphone?

8           THE DEFENDANT:  I just ask, Kays, like I haven't

9   cause no problem in your courtroom.  I had -- during trial,

10  I've been respectful to you-all.  I ain't acted all crazy.

11  Like I don't want you to think I'm a monster or animal.  You

12  know what I'm saying?  Like this lawyer right here, we have

13  every possible -- irreconcilable differences.  We is not on

14  the same page.

15          THE COURT:  Stop.  Stop.  Stop.  You're going to

16  have a chance to talk.  Right now I have to do a couple things

17  before I give you a chance to talk.

18          THE DEFENDANT:  Yeah.  But I want to let you know,

19  we ain't talked about -- this lawyer ain't came to talk to me

20  or nothing.  I haven't seen him since trial.

21          THE COURT:  Stop talking for just a minute,

22  Mr. Carnes.  I'm -- I'm going to be the one who tells you when

23  you can talk and when you can't talk.  That's the way it works

24  for everybody.  You can't talk right now.  Stop for just a

25  minute.  Let me go through this with you.

1          I note that this case was tried to a jury for three

2     days from November 4th to November 6, 2019.  At that time this

3     defendant was found guilty in Count 1, being a felon in

4     possession of a firearm; in Count 2, being an unlawful user of

5     a controlled substance in possession of a firearm; in Count 3,

6     the same crime as Count 2 but at a different time, unlawful --

7     being a drug user in possession of a firearm as well.  The

8     jury returned verdicts of guilty as I said.  This Court

9     ordered -- this Court ordered a presentence investigation to

10    be completed, and that has been accomplished.

11          Today my first responsibility is to calculate the

12    guideline calculations.  But before I do that, Mr. Carnes has

13    filed a motion to proceed pro se.  That is document 109.  I

14    have filed a order, which is document 118 concerning this.  In

15    order for me to allow Mr. Carnes to proceed pro se, I have to

16    ask him questions.  And if he can answer those questions we

17    can talk about that.  But he doesn't get to talk right now

18    other than address or respond to my questions.

19          Mr. Carnes, I note that we've already been through

20    this with you before on October 29th, 2019.  It was a pretrial

21    conference before the trial.  In that pretrial conference we

22    took up your motion to proceed pro se.  You filed this before.

23    And you, at that time, decided to use Mr. Truesdale as your

24    attorney and proceed with counsel.

25          So at that time I made an entry that -- hold on.  I

1  promise you, Mr. Carnes, you'll be able to talk.  The

2  defendant indicated that he no longer wishes to proceed pro

3  se.  That was at -- from 2:02 p.m. to 2:30 -- 2:53 p.m. on

4  October 29th.  So we had a trial.  And now you filed other

5  motions to proceed pro se.  So I have to ask you some

6  questions.

7          Will you answer my questions first, Mr. Carnes?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Okay.  So at this time the questions are

10  pretty much the same questions I probably asked you before.

11  Have you -- do you have any education in the law?

12          THE DEFENDANT:  High school diploma, yeah.

13          THE COURT:  In high school you did?

14          THE DEFENDANT:  Yeah.  High school diploma, Seton

15  Center, 2009.

16          THE COURT:  Okay.  Have you -- do you have any

17  understanding of the Federal Rules of Criminal Procedure?

18          THE DEFENDANT:  I've been learning.

19          THE COURT:  I'm sorry, sir?

20          THE DEFENDANT:  I've been learning them.

21          THE COURT:  You've been learning them since you've

22  been incarcerated?

23          THE DEFENDANT:  Yeah.  I've been learning and

24  studying them.  Yes, sir.

25          THE COURT:  Okay.  Do you understand how the Court

1  undertakes sentencing hearings, the process that we use to

2  conduct a sentencing hearing, Mr. Carnes?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Do you understand the range of

5  punishment in this case is not more than 10 years on all three

6  counts, and these 10 year sentences could be ran consecutive

7  if you're sentenced to those terms for a total of 30 years?

8  You could go to prison for 30 years in a case like this.  Do

9  you understand that?

10          THE DEFENDANT:  I -- I thought -- I read something

11  different on a PSI, they ran them concurrent.  You're saying

12  that's -- that's if you wanted to run them consecutive?

13          THE COURT:  No.  I said that your exposure, your --

14  your liability could be up to 30 years in prison on this case.

15  Do you understand that?

16          THE DEFENDANT:  Yeah.  I understand that.

17          THE COURT:  Okay.  Do you understand that if you

18  decide to proceed pro se today, you don't get any privileges

19  extra other than -- other than being treated like an attorney

20  basically in how you conduct your case?

21          THE DEFENDANT:  Yeah.

22          THE COURT:  You understand that if you speak out and

23  talk when you're not allowed to, you could be removed from the

24  courtroom and you can't -- you won't be part of this hearing

25  in that case?  Do you understand that?

1                THE DEFENDANT:  Yes, I understand.

2                THE COURT:  And you understand that any time during

3    that hearing if I feel like you're not following the rules,

4    we'll ask your standby counsel, Mr. Truesdale, to assume the

5    leadership that -- the lead in your case?  Do you understand

6    that?

7                THE DEFENDANT:  Yeah.  I understand that but I will

8    not like that.

9                THE COURT:  That's all right.  You don't have to

10   like any of this, right?

11               THE DEFENDANT:  Yeah.

12               THE COURT:  I'm just trying to make sure you

13   understand it.

14               THE DEFENDANT:  Yeah.  I don't want Mr. Truesdale.

15   I don't want no ties with them.  He's on their side.  He's

16   working with them (indicating).

17               THE COURT:  You see, this is an example where you're

18   not responsive.  I want you to answer my questions.  If you

19   can't answer my questions, you can't --

20               THE DEFENDANT:  I'm answering -- I'm answering,

21   Judge Kays.

22               THE COURT:  No.  No, you're not, Mr. Carnes.  Listen

23   closely to the questions, respond to the questions.  Don't

24   give me any of your editorial.  I'll let you editorialize

25   later, okay?

1          THE DEFENDANT:  Yeah.

2          THE COURT:  You get a chance -- so you understand,

3     Mr. Carnes, when we're done here, you will get a chance to

4     have the last word before I pronounce sentence.  At that time

5     you can talk.  You understand that?

6          THE DEFENDANT:  So I can say -- you're saying I get

7     to talk only after you finish with my sentence?

8          THE COURT:  Yes, sir.

9          THE DEFENDANT:  So I don't get to object and say

10    nothing and go at my things?  That's what I supposed to do

11    is --

12         THE COURT:  You're illustrating a very poor

13    understanding of how sentencing hearings work, Mr. Carnes.

14         THE DEFENDANT:  That's how I was supposed to go as

15    pro se, sir.  I'm supposed to work my own case, and I object

16    to everything.

17         THE COURT:  Stop talking.  Stop talking.  Now, so

18    Mr. Carnes, I don't feel like you really understand how a

19    sentencing hearing works.  I think based on the way I

20    understand the *Faretta* case, which is the -- kind of a

21    landmark case about pro se representations, which I think you

22    may have even cited in your materials, Mr. Carnes, you do have

23    a right to -- no.  Stop talking.

24         THE DEFENDANT:  I'm trying.

25         THE COURT:  You do have a right to proceed pro se

1    for a period of time.  I will be very quick to withdraw that

2    right or terminate that right if we have problems.  You

3    understand that?  Say yes or no.

4            THE DEFENDANT:  Yes, sir.  Yes, sir, Mr. Kays.

5    Judge Kays.

6            THE COURT:  Okay.  So at this time my job first is

7    to calculate these guideline calculations, to make the

8    guideline calculations.  And I will look forward to -- well,

9    the problem is Mr. Truesdale is an expert in this, and he's

10   not -- he's on standby right now.  Mr. Alford is an expert in

11   this.  Do you have any expertise in sentencing guideline

12   calculations, Mr. Carnes?

13           THE DEFENDANT:  Yeah, I got my own expert

14   calculations.

15           THE COURT:  Okay.  Very well.  So let's do this

16   then.  Let's go through this PSR.  So at this time I am going

17   to -- I'm going to sustain his motion to proceed pro se.  So

18   he can proceed at this time.

19           Mr. Truesdale, I'm going to appoint you standby

20   counsel.  And you may very well go to work here very quickly.

21           MR. TRUESDALE:  Yes, Your Honor.

22           THE COURT:  All right.  So the United States

23   probation office has recommended the Court adopt the following

24   guideline calculations:  A total offense level of 24, a

25   criminal history category of IV; a guideline range of 77 to 96

1  months; a supervised release range of one to three years; a

2  fine range of 20,000 to $200,000; a special assessment of $100

3  per each count for $200 total.

4         Mr. Alford, does the government agree with those

5  calculations?

6         MR. ALFORD:  Yes, Your Honor.

7         THE COURT:  Mr. Carnes, do you agree with those

8  calculations?

9         THE DEFENDANT:  Where did it say, sir?

10        THE COURT:  I'm sorry?

11        THE DEFENDANT:  I say, where is that at?  I'm --

12        THE COURT:  I just said it.  I just said it on the

13  record for you to hear, Mr. Carnes.

14        THE DEFENDANT:  Can you repeat it one more time,

15  sir?

16        THE COURT:  I'll be happy to.  The total offense

17  level is 24, the criminal history category is IV.  The

18  guideline range is 77 to 96 months.  The supervised release

19  range is one to three years.  The fine range is 20,000 to

20  $200,000.  There is a special assessment of $100 per count,

21  for a total of $200 mandatory special assessment.

22        Do you understand that is what the United States

23  probation office has recommended the Court adopt as the

24  guidelines in your case?  Do you have any objection to those

25  guidelines?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.  What is your objection?

3          THE DEFENDANT:  Can you hold on just a second, sir?

4          THE COURT:  I sure can.

5          THE DEFENDANT:  Can I ask you, can I remove one

6    handcuff so I have more --

7          THE COURT:  No.

8          THE DEFENDANT:  -- moving around with papers,

9    please?

10          THE COURT:  Let's make sure we're clear on that and

11    the record is clear.  This Court defers to the marshal service

12    for all security issues.  They are security professionals.

13    This is what they do.  They have decided that you will be

14    handcuffed, and your legs shackled for the record.  I think

15    part of this has to do with the fact there's alleged -- an

16    alleged assault against a corrections officer while you were

17    incarcerated, which I understand we'll hear about, and it's

18    part of the second addendum.

19          THE DEFENDANT:  That's -- I'd like to object to

20    that.

21          THE COURT:  Sure.  But that's not -- that's not the

22    question.  You're not responding to the question.  The

23    question today before you right now is, what are your

24    objections to the sentencing guidelines, sir?

25          THE DEFENDANT:  My objections is that the four

1   points enhancement of the Terrence Walls -- that Terrence

2   Walls said I shot at him.  They you -- they give you four

3   points enhancement on this.  That --

4          THE COURT:  Why don't you sit down and talk in the

5   microphone so I can hear you.  Please keep your mask on.

6          THE DEFENDANT:  I said, it's the four points

7   enhancement with Terrence Walls.  He's saying I shot at him.

8          THE COURT:  Please -- please pull your mask up over

9   your nose.

10          THE DEFENDANT:  Okay.  It's the four points --

11          THE COURT:  Over your nose, please.  Okay.  Go

12   ahead.

13          THE DEFENDANT:  Take my time.

14          THE COURT:  I note, while he's doing that, we

15   appreciate everybody wearing masks in the courtroom today.  We

16   believe that's important to help us be safe here.  And so

17   thank you for your agreement to do that.

18          Go ahead, Mr. Carnes.

19          THE DEFENDANT:  Okay.  The four points enhancement

20   for Terrence Walls saying that I shot at him, like I want to

21   object to that, like 'cause there was never no positive ID

22   pick out no line-up on -- on -- on -- on 9-24-16.  I got

23   charged with this on 9-10 -- on 9-10-16, you know what I'm

24   saying?  That my accident happened on August 30th, 2016.  So

25   I'm in the KC marshal custody in the hospital, and got

1    released over here to the -- this -- the state -- I mean, to

2    the -- to the Jackson County.  And I sat over there in Jackson

3    County for like two days, and then Agent Frank Rorabaugh came

4    and got me, you know what I'm saying?  And I asked Frank

5    Rorabaugh like what's going on.

6         THE COURT:  Okay.  Okay.  You got to -- you got to

7    put this as a legal objection.  Do you have a legal objection

8    to this?

9         THE DEFENDANT:  Yeah.  My --

10        THE COURT:  You're arguing -- you're arguing

11   factual --

12        THE DEFENDANT:  My legal objection is -- my legal

13   objection is that the man, Terrence Walls, never positively

14   identified me as a line-up.  Mr. Truesdale, Jonathan Truesdale

15   failed to explain himself -- failed to --

16        THE COURT:  Okay.  Okay.  Hold on.  Hold on.  Stop.

17   Stop.  Your objections are overruled.  Do you have any other

18   legal objections?

19        THE DEFENDANT:  It's just that -- it's just the four

20   points enhancement, that's all the objections that I seen --

21   take my time.  Let go through something a little bit.

22        THE COURT:  While we're doing this --

23        THE DEFENDANT:  Judge Kays.

24        THE COURT:  Yes, sir.

25        THE DEFENDANT:  Judge Kays, sir, I'd like to -- hold

1  on.  Wait.

2         THE COURT:  Take -- while you're doing that, maybe

3  would one of the marshals help us to make a record of why he's

4  shackled here today and just so the record is clear on that?

5  Would --

6         THE DEFENDANT:  I never --

7         THE COURT:  Hold on.  Stop talking.  Would one of

8  the marshals like to address that for us, maybe in a

9  microphone or maybe through the U.S. Attorney's office?

10         THE DEFENDANT:  Can you address it to the Court?

11         THE COURT:  Shhhh.  Stop talking.  I'm going to tell

12  you when you can talk.  Hold on.

13         Or maybe -- if you'd rather the U.S. Attorney speak

14  for you.

15         MARSHAL SEELING:  Yes, please.

16         THE COURT:  Mr. Alford, sir.

17         MR. ALFORD:  Why Your Honor --

18         THE COURT:  Why is -- why is it that we have

19  Mr. Carnes incarc -- shackled and handcuffed here today?

20         MR. ALFORD:  Well, I think there's numerous reasons

21  for this.  First, it's the facts of this case that were

22  revealed at trial.  He shot at Terrence Walls.  Evidence of

23  that was very clear, which supports the four-level

24  enhancement.  He was in a gun fight where he was shot numerous

25  times, and he discharged his weapon and it jammed, which is

1　　how the weapon was found.  And that led to the car accident

2　　where he actually killed someone.

3　　　　　　He has a prior criminal history where she shot at

4　　individuals.  And not only shot at them, he shot them.  He was

5　　successful in his aim.

6　　　　　　And also with respect to his interactions with the

7　　Court throughout these proceedings, he hasn't shown any

8　　manners or discipline, for the most part.  With some

9　　exceptions, during trial I think he was for the most part.

10　　　　　　THE COURT:  He's a security risk?

11　　　　　　MR. ALFORD:  Absolutely a security risk.  And I

12　　think it's totally appropriate that the marshals are taking

13　　precautions.

14　　　　　　THE COURT:  Is part of that what's listed in the

15　　second addendum to the presentence investigation report, which

16　　is dated September 23rd, 2020?

17　　　　　　MR. ALFORD:  Yes, Your Honor.  And, in fact, at the

18　　sentencing hearing we intend on providing evidence where the

19　　defendant, apparently from a video, preyed on a female

20　　corrections officer and attacked her to the point where

21　　another detainee was so concerned that the detainee intervened

22　　to protect the corrections officer.

23　　　　　　THE COURT:  I think the record is clear, and yes,

24　　Deputy Marshal Scott Seeling, sir.

25　　　　　　MARSHAL SEELING:  I will also add that it is common

1  practice for the marshal service to produce defendants in

2  court in this district in leg shackles and handcuffs for all

3  defendants before magistrates or district judges.

4  THE COURT:  Thank you, Deputy Marshal.  So that's --

5  I think the record is clear now why that we're doing that, and

6  the record should also reflect that the Court -- this Court

7  does defer to the marshal service in all decisions related to

8  security.

9  All right.  Any other legal objections, because I'm

10  getting ready to move on, Mr. Carnes.

11  THE DEFENDANT:  Your Honor, I think these marshals

12  they took some of my paperwork out of my thing, because I'm

13  looking for the write-up.  It was just in here about this

14  write-up that they're talking about with that -- this Officer

15  Bell.  But they have it -- I'm looking for the write-up

16  papers.  They -- they took it up out of here.  They took it --

17  they just served me Monday, and the PSI, Day, the case worker

18  served me the paper that they disclosed it late Monday.

19  THE COURT:  Hold on.  Are you talking about the

20  second addendum that I referred to?  And if so, would you like

21  a copy of mine?

22  THE DEFENDANT:  Huh?

23  THE COURT:  Would you like to have a copy?

24  THE DEFENDANT:  Yeah, I'd like to have that copy,

25  please.  They took it from me.

1         THE COURT: Okay. I'm going to show the marshal is

2 helping us by handing to Mr. Carnes the second addendum to the

3 presentence investigation report.

4         THE DEFENDANT: I'd like to object to this because

5 it's saying, according to an incident report on July 29th,

6 2019, at approximately 6:36 p.m., an emergency was called in

7 regard to a staff member being assaulted. Inmate Carnes

8 pushed --

9         THE COURT: Hold on. Hold on. Hold on. Hold on.

10 Stop. Stop.

11         THE DEFENDANT: -- his way in and grabbed

12 Correctional Officer Bell by his shirt.

13         THE COURT: You're not stopping.

14         THE DEFENDANT: He just said she.

15         THE COURT: You're not stopping.

16         THE DEFENDANT: Where are his comment?

17         THE COURT: We're going to hear some evidence about

18 that. Hold on. You've got to stop when I tell you to,

19 Mr. Carnes. You're going to --

20         THE DEFENDANT: I thought you say you were going to

21 let me play out, sir.

22         THE COURT: Stop. You -- that -- first, let's

23 establish that I've given you a copy of what you said was

24 missing; is that correct?

25         THE DEFENDANT: Yes, sir.

1          THE COURT:  Okay.  And you object to that?  You

2     think --

3          THE DEFENDANT:  Yeah, I object to that.

4          THE COURT:  -- it's not factual, true?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Okay.  Anything else?  Any other legal

7     objections?

8          THE DEFENDANT:  They're saying that it was a female

9     officer.  On this paper it's saying it's a male officer.  This

10    ain't right.  They got to correct this, Your Honor.

11         THE COURT:  Any -- any other legal objections?

12         THE DEFENDANT:  Other legal objections with the four

13    points --

14         THE COURT:  Sit down, please.  Sit down.

15         THE DEFENDANT:  The four points enhancement, you --

16         THE COURT:  I've already ruled.

17         THE DEFENDANT:  -- you stopped, Judge -- you stopped

18    Truesdale when he was questioning Ter -- David -- Detective

19    David Kissee on the stand.  You made a big huge mistake, Judge

20    Kays.

21         THE COURT:  Let's take him out of the courtroom.

22         THE DEFENDANT:  You made a big huge mistake, Judge

23    Kays.  Like you got *Brady* violations.

24         THE COURT:  I'll give you five minutes to think

25    about it and then bring you back in.

1          THE DEFENDANT:  (Indiscernible) on *Brady* violations,

2   you know what I'm saying?  Like you got the (indiscernible).

3          THE COURT:  I'd like the record to reflect the

4   defendant is not -- he's still talking as the marshals take

5   him out of here.  We're going to let him sit for five minutes

6   and see if we can bring him back in.  And the Court is asking

7   -- I know there's people here in the audience that will be

8   perhaps testifying.  We -- we ask for your indulgence and

9   patience in this part.  It's very important that we are

10  patient with Mr. Carnes here today the best we can be.  I

11  don't know if he'll be able to come back in or not, but we'll

12  certainly give him an opportunity to do that.  So we'll take a

13  five-minute recess.  Okay?  Thank you.

14         (Recess at 9:53 until 9:59 a.m.)

15         THE COURT:  All right.  Let's try this again.  Thank

16  you.  Be seated.

17         (Defendant now present.)

18         THE COURT:  Thank you, Marshals.

19         Mr. Carnes, let's just talk -- let me talk to you a

20  little bit about this.  We've accomplished very little in the

21  30 minutes we've been working to conduct this hearing.  What I

22  want to say to you is this:  You have a right to be here, and

23  I want you to be here if you can conduct yourself, sir.  I

24  really do.  If you don't want to be here, though, that's all

25  right too.  We can put you in a holding cell.  We have one

1      available I'm told by the marshal service.  There's audio

2      that's in that cell so you can hear what's going on.  So if

3      you don't stop talking when I ask you to, or if you're

4      interruptive -- interrupting people or disrespectful, I'm

5      going to have to remove you again, and I'd prefer not to do

6      that, honestly, Mr. Carnes.  This is much better if you're

7      here for your sentencing.

8              So, Mr. Carnes, can you commit to me that you will

9      conduct yourself appropriately based on what I've just told

10     you?

11             THE DEFENDANT:  Yes, sir.  Yes, sir.

12             THE COURT:  Okay.  Thank you, Mr. Carnes.  And, you

13     know, you did say something earlier, and I agree with you, you

14     did conduct yourself I thought respectfully through the trial.

15     And I appreciated that, and I think we talked about that.  So

16     thank you for doing that.  But today's an important day as

17     well, okay?  So at this time I'm going to overrule all

18     objections, and I will adopt the proposed guideline

19     calculations of the United States probation office.

20             So that's -- so we -- I want to say this again, so

21     it's clear, and I may -- I misspoke earlier, and I'll tell you

22     where I misspoke.  Total offense level 24, criminal history

23     category IV.  Guideline range of 77 to 96 months.  Supervised

24     release range of one to three years.  A fine range of $20,000

25     to $200,000.  And I originally said the special assessment is

1    $100 per count for $200.  That's incorrect.  It's $100 per

2    count, and there's three counts, so it's $300 instead of $200.

3    Just so we're clear on that.

4         Now, based on that, I believe that's consistent with

5    the Court's rulings, and that's how we'll proceed at this

6    point in time with those guideline calculations.

7         So at this time the government has indicated there's

8    evidence that you wish to present at this time.

9         MR. ALFORD:  Yes, Your Honor.  And I put this in my

10   memorandum, I do think that Counts 1 and 2 for sentencing

11   purposes merge, because they involve the same nucleus of

12   operative facts.  One is a -- they're just different theories

13   of culpability.  One is being a knowing unlawful user of a

14   controlled substance, and the other is being a knowing felon

15   in possession of a firearm.  So I think although it's totally

16   appropriate for the government to have had two counts before

17   the jury for purposes of sentencing, because it's the same

18   firearm, the same nucleus of operative facts, it's my belief

19   that they merge for sentencing.

20        THE COURT:  Okay.  Very good.  So that means I need

21   to advise Mr. Carnes that he's looking at the potential, worst

22   case scenario of 20 years in prison instead of 30 years in

23   prison, is that correct?

24        MR. ALFORD:  That's correct, Your Honor.  And I

25   think that's probably also where you came with the $200

1  special assessment.

2        THE COURT:  Oh, okay.  Well, thank you, Mr. Alford.

3        MR. ALFORD:  Yes, sir.

4        THE COURT:  So that -- that -- that's something I

5  need to talk to you about, Mr. Carnes.  So I originally said

6  there's three counts.  All of these counts are punishable by

7  not more than 10 years.  Mr. Alford believes, and I assume

8  we'll be seeking no more than, up to 20 years in prison is the

9  maximum liability you're exposed to on these cases.  And I

10 said $200 special assessment, and Mr. Alford is telling us

11 that he believes that that's the maximum that you can receive

12 as far as the mandatory special assessment, not $300.  Even

13 though there's three counts.  So very good.

14       Do you understand those changes?

15       THE DEFENDANT:  Yes, sir.

16       THE COURT:  Okay.  Thank you.

17       Please -- please proceed.

18       MR. ALFORD:  Your Honor, I have, with respect to

19 evidence to present here at this sentencing hearing, I have

20 five exhibits.  I've provided them to the Court and to

21 Mr. Truesdale ahead of time.  I actually have extra copies for

22 the defendant.  May I have the marshals --

23       THE COURT:  Would you hand those to the marshals,

24 please?

25       MR. ALFORD:  So, Your Honor, the United States first

1  offers Government Exhibit 1, which is a email from CoreCivic,

2  which is a --

3          THE DEFENDANT:  Objection.

4          THE COURT:  Hold on.  Hold on.  I'm going to give

5  you a chance, Mr. Carnes, I promise you.

6          Go ahead.

7          MR. ALFORD:  Which is an incident report related to

8  an alleged assault that the defendant was engaged in on July

9  29th of 2019 at CoreCivic.  This is just an email

10 correspondence from the marshal service, specifically Deputy

11 Marshal Michael Jacobson who provided this incident report to

12 Mr. Truesdale and I after it occurred.  And so we're just

13 offering that into evidence.

14         THE COURT:  And so let me make sure that I

15 understand.  Is this exhibit, it's Deputy Marshal Michael

16 Jacobson sent this to Trey Alford and Jonathan Truesdale on

17 Wednesday, July 31st, 2019, is that what you're talking about?

18         MR. ALFORD:  Yes, Your Honor.

19         THE COURT:  Okay.  Mr. Carnes, you have an objection

20 to that, sir?

21         THE DEFENDANT:  Yeah.  I'd like to object to -- to

22 this paper right here.  They never gave me a copy of this

23 paper until just today.  And this paper right here I just

24 received this Monday from Case Worker Day.  And this is saying

25 this is a male officer, and this is saying this is a female

1  officer.

2           THE COURT:  Okay.

3           THE DEFENDANT:  It's incorrect.  And on that date --

4  that date -- - what date was this?  6 -- excuse me.  July 29,

5  2019, I was getting beat up and jumped --

6           THE COURT:  Hold on.  Hold on.  Hold on.  No, now is

7  not your time.  I want to know what your legal objection is.

8  You think this is inaccurate; is that correct?

9           THE DEFENDANT:  Yeah.  It's inaccurate.  Yes, sir.

10          THE COURT:  Okay.  Your objection is overruled at

11 this time.

12          What else?

13     (Government Exhibit 1 admitted in evidence.)

14          MR. ALFORD:  Your Honor, I also offer Government

15 Exhibit 2, which is restitution documentation, which is

16 actually attached to the PSR that it was provided by Terrence

17 Walls to the probation officer, specifically Kurt Habiger.

18 And it basically is an estimate of damages that were sustained

19 to his vehicle when the defendant shot at it and put holes

20 through it.  And we're just offering that information that

21 Terrence Walls provided to the probation office.

22          THE COURT:  And so we're clear, this declaration --

23 it's a declaration of victim losses.  It was -- there appears

24 to be three pages to that; is that correct?

25          MR. ALFORD:  Yes, Your Honor.

1          THE COURT:  Okay.  And that's Exhibit 2.  Do you
2     have an objection to Exhibit 2, Mr. Carnes?
3          THE DEFENDANT:  Yeah.  I got an objection to Exhibit
4     2.
5          THE COURT:  Okay.  What's your legal objection to
6     Exhibit 2, sir?
7          THE DEFENDANT:  My legal objection is I've never
8     shot this Terrence Walls.
9          THE COURT:  Okay.
10         THE DEFENDANT:  You know, I never shot this Terrence
11    Walls and Terrence Walls never positively ID'd me out of no
12    line-up.  He said he marked five or six -- or six because the
13    shooter had shorter hair.  He picked me --
14         THE COURT:  Okay.  Hold on.  Stop.  Stop.  We're
15    going to stop you.  Your objection is based upon it's
16    inaccurate, it's not truthful.  Your objection is overruled at
17    this time.  Please proceed.
18         (Government Exhibit 2 admitted in evidence.)
19         MR. ALFORD:  Yes, Your Honor.  Government Exhibit 3
20    is a video that was taken at CoreCivic in Leavenworth, Kansas
21    that identifies the defendant in this altercation.  We
22    provided a copy of that to the Court based off the defendant's
23    decision to go pro se and his refusal to confer with his
24    attorney.  My guess is he has not seen the video.  So my
25    recommendation to the Court is we are able to play it here,

1   and we would offer to have it admitted so that the Court and

2   the defendant can see it.

3           THE COURT:  Okay.  And I note there is a monitor on

4   the table.  That will be played through that monitor so the

5   defendant can see it, correct?

6           MR. ALFORD:  That's my belief that we know of.

7           THE COURT:  And this is document 3.  And document 3,

8   so we're clear, is related to -- or it's the video that's

9   described in the second addendum to the presentence report,

10  correct?

11          MR. ALFORD:  That's correct.  And it also relates to

12  the incident report that the marshal service sent to

13  Mr. Truesdale and I that's marked as Government Exhibit 1.

14          THE COURT:  Very well.  Please present Exhibit 3.

15          And look closely, Mr. Carnes, that this video -- the

16  monitor on your table will have the video they're playing.

17      (Government Exhibit 3 played.  No sound.)

18          THE DEFENDANT:  He helped.  They choking me up.

19  He's spraying me with mace.  Excessive force.  Now is when I

20  would like you to stop talking, Mr. Carnes.  I'll give you a

21  chance in a minute.

22          THE COURT:  I note this is the end of it.  Towards

23  the end they're just taking him out of the cell.  Is there

24  anything else probative of this video that we need to see?

25          MR. ALFORD:  No, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Carnes, did you laugh during the course of this

3    video?  Did I hear you laugh?

4          THE DEFENDANT:  I've never seen this video.  I seen

5    my booty come out, you know.  Excuse me.  I seen my behind

6    come out, and I kind of smirked.  But --

7          THE COURT:  Is that why you were laughing?

8          THE DEFENDANT:  Yeah.  That's why I laughed, I seen

9    my butt -- my butt come down.

10          THE COURT:  Okay.

11          THE DEFENDANT:  But I was wondering where the other

12   video before that one?  Because --

13          THE COURT:  Okay.  Hold on.  Hold on.  Hold on.

14   I'll give you a chance.  So this is marked as Exhibit 3 --

15          MR. ALFORD:  Yes, Your Honor.

16          THE COURT:  -- correct?  And you're offering this

17   into evidence at this time?

18          MR. ALFORD:  I am, Your Honor.

19          THE COURT:  And your objection to this -- your legal

20   objection to this is what, Mr. Carnes.

21          THE DEFENDANT:  Legal objection is that I got jumped

22   inside the pod, and I was running to get help and I needed her

23   help.  And I was trying to get her to help me.  And I was

24   telling her to help me.  And I was having a mental breakdown

25   from my anxiety attack.  I needed help.  They was trying to

1  jump me, and I needed her help.  I suffered -- I put in

2  grieving -- sick calls.  I put her as a witness.  She said --

3  she said -- Ms. Bell, she's from Africa.  She's over here.

4  She said that -- that -- that -- that Chief Rice was trying to

5  get her to go down to Leavenworth Police Department --

6              THE COURT:  Okay.  Stop.  Stop.

7              THE DEFENDANT:  -- and file charges on me.

8              THE COURT:  Stop.  Clearly, so the record is clear,

9  this is -- Exhibit 3 has no audio to it.  It does appear, and

10  Mr. -- Mr. Carnes has confirmed it's his rear end that's

11  showing in this video.  That he was grabbing a correction

12  officer by the neck is what it appears to be.

13              Now the question is, Mr. Carnes has taken issue with

14  the misuse of a personal pronoun, he versus she.

15              Mr. Alford, can you help me understand that?

16              MR. ALFORD:  It's my understanding, it's a female.

17  But for purposes of this, I don't think it matters, Judge.  I

18  don't think it matters whether it's a he or a she.  I think it

19  matters that he attacked a correction officer.

20              THE COURT:  It appears, by what I've seen, by the

21  video this was a female correction officer.

22              MR. ALFORD:  That's my belief, Judge.

23              THE COURT:  Yes.  And whether or not someone wrote a

24  different -- used a different pronoun doesn't win the day for

25  you today, Mr. Carnes.  So at this time I will admit Exhibit

1  3. All right?

2        Please proceed.

3     (Government Exhibit 3 admitted in evidence.)

4        MR. ALFORD:  Your Honor, at this time the United

5  States would request that the Court consider some unsworn

6  victim impact statements.  I've conferred with the marshal

7  service, and the Court might have totally intended on doing

8  this anyway, but the United States --

9        THE COURT:  Hold on.  I didn't understand that last

10 part.

11       MR. ALFORD:  The Court might have totally intended

12 on doing what I'm about to propose, but I would like to, after

13 conferring with the marshal service, to request that they be

14 allowed to make their victim statement at the witness box.

15       THE COURT:  Sure.

16       MR. ALFORD:  Just for their protection and the

17 pandemic.  It will be easier for them to speak without a mask

18 on.

19       THE COURT:  Yes.  That would be fine.

20       MR. ALFORD:  And so the United States would like to

21 first request Jackie Mercer.  And she recently had an injury,

22 so she might need a little help getting up to the witness box.

23       THE COURT:  Okay.  Yes, sir.  We'll allow that.

24       Please put your mask on, Mr. Carnes.

25       Welcome to you, Ms. Mercer.  And since you have

1    plexiglass we're going to allow you to remove your mask as you

2    sit there, if you'd like to.  If you're comfortable doing that

3    you're welcome to do that.

4            THE WITNESS:  Thank you.

5            THE COURT:  Ms. Mercer, would you please begin,

6    ma'am, by speaking your full name and spelling your last name

7    for our record.

8            THE WITNESS:  My name is Jacquelyn Canon Mercer,

9    M-E-R-C-E-R.

10           THE COURT:  Ms. -- I'll offer you a water.  We're

11    using bottled water in this pandemic climate.  So you're

12    welcome if that would help you, and there's some Styrofoam

13    cups there next to you, Ms. Mercer, and you're welcome to use.

14    And I'm going to allow you to just ask some questions so you

15    can orient this witness on the record to relationships and the

16    purpose that she's here.

17           MR. ALFORD:  Yes, Your Honor.

18           Ms. Mercer, is it fair to say that you're the mother

19    of Patrick Mercer?

20           MS. MERCER:  I am.

21           MR. ALFORD:  And he died as a result of a motor

22    vehicle car wreck with the defendant; is that right?

23           MS. MERCER:  That's correct.

24           MR. ALFORD:  And prior to testifying today, we

25    conferred and you indicated a desire to make a statement to

1  the Court; is that right?

2          MS. MERCER:  Yes.

3          MR. ALFORD:  And it's my understanding that you've

4  prepared something to say to the Court?

5          MS. MERCER:  I have.

6          MR. ALFORD:  And would you like to do that at this

7  time?

8          MS. MERCER:  Yes.

9          MR. ALFORD:  Okay.  Please do so.  Thank you.

10          THE COURT:  And Ms. Mercer, I always tell people

11  when they're getting ready to read something -- I know this is

12  a difficult day, so take your time -- and please read -- we

13  usually read faster than we talk.  So our court reporter is --

14  her job to write everything down and we ask people to slow

15  down when they read a little bit.  Okay?

16          MS. MERCER:  Okay.

17          THE COURT:  Thank you.  Please proceed.

18          MS. MERCER:  August 30th, 2016, the day that changed

19  our lives forever, Patrick's, his brothers, Kelly and Jack,

20  his father, grandfather, his aunts, uncles, cousins, his many,

21  many friends, his longtime girlfriend, his teammates, his work

22  mates, his precious dog, Chewy, and me.  That day changed

23  everything and everyone.  A mother's worst nightmare.  That

24  phone call that you have prayed your whole life to never

25  receive, but because of just one selfish, disrespectful,

1  irresponsible person whose terrible decision that day took our

2  Patrick --

3           THE DEFENDANT:  (Indiscernible.)

4           THE COURT:  Hold on.  Hold on.  Hold on.

5           THE DEFENDANT:  You can't do me like that.  You

6  can't do me like that.  (Indiscernible.)

7           THE COURT:  All right.  Let's take him out.

8           THE DEFENDANT:  They was trying to kill me.  I was

9  trying to save my life.

10          THE COURT:  Take him out.

11          THE DEFENDANT:  I didn't mean to do that.  They was

12  trying to kill me I was trying to save my life.

13          THE COURT:  Please stop.

14          THE DEFENDANT:  I didn't mean to do that to you-all.

15  (Indiscernible) I'm sorry.  I'm sorry.  (Indiscernible) my

16  kids (indiscernible).  I didn't mean to do that to you.  I'm

17  sorry. (Indiscernible)

18          THE COURT:  Our chief -- our Chief Deputy Marshal

19  Seeling is present.  We would like you to make sure he can

20  listen to the audio version of this, please.

21          MARSHAL SEELING:  Yes, sir.

22          Turn the audio on back there.

23          THE COURT:  I note that we've removed the defendant

24  from the courtroom because of a very loud and disruptive

25  outburst.  And once again, he wouldn't stop talking until they

1    got him out of the -- into a holding cell, I guess, adjacent

2    to the courtroom.  The Deputy Marshal Seeling has ensured that

3    they will play the audio of what we're doing in here so he can

4    hear it.  It's clear he can't -- he can't maintain any level

5    of obedience to the Court's earlier order.

6           So at this time, I apologize, Ms. Mercer, for that

7    outburst.  And would you like to proceed, ma'am?

8           MS. MERCER:  Again, because of just one selfish,

9    disrespectful, irresponsible person whose terrible decision

10   that day took our Patrick away from his world, our world, and

11   for me an automatic membership into the club of mothers who

12   have lost their children, the club no one wants to belong to,

13   but do.

14          Let me tell you about my Patrick.  My life blessed

15   and full, I am the mother of three sons.  Patrick is my middle

16   son, the tallest, sweetest, bright, kind, loving, athletic,

17   hard working, motivated, driven, a leader, handsome, educated,

18   and easy -- easy.  Patrick fit the mold of the middle child to

19   a tee.  When he was maybe four years old or so I sat him down

20   and said, "Patrick, promise me that you will always be my calm

21   between my two storms."  Patrick replied, "I promise, Mommy."

22          Looking back I realized my life is represented in

23   two parts, the before, and the now.  Because the before August

24   30th, 2016, life was so fun, exciting, busy, a wonderful

25   chaos, really.  The now I just attempt to live life with a

1   broken heart.  I felt weak, the guilt that I felt for being

2   alive when Patrick was not was dreadful.  My heart hurt so bad

3   it was -- it was broken.  A piece just gone, and I knew that

4   it was gone forever.  It's interesting, I can look through

5   photos and comparing the before to the now I see it.  It's in

6   my smile, and it's in my eyes, even in my posture.  The

7   flicker of life has dimmed.

8           Even happy times are difficult.  I want to be happy

9   and I am happy, and then there is that missing part of my

10  heart, and just like that happy flows right out of my body.

11          There is always an empty chair at every family

12  dinner, every holiday that missing Patrick smile and laugh.

13  Every celebration or party I find myself looking around but

14  there is no Patrick.

15          I live in fear and anxiety when I drive, when my

16  other two sons drive, sleeping is impossible.  I close my eyes

17  and the film of August 30th, 2016, plays on and on.  Awake or

18  asleep, I live a mother's nightmare.  Grieving Patrick is like

19  riding a wave.  I never know when or where.  It could be a

20  song, or it could be a movie.  It could be a particular

21  street, a particular hospital, a siren, an ambulance, or every

22  Tuesday evening, and I'm mad.

23          I prided myself as a very loving, fun mother.  My

24  boys are my life, and there's nothing that I would not do for

25  them; however, I held my boys very accountable for all of

1   their actions.  The bar was high in our home.  I demanded

2   their perfection, not to be perfect, but to find their own

3   individual perfect.  In other words, be the best that you can

4   be each and every day, because I believe my three sons were

5   100 percent a direct reflection of me, their mother.

6           Say please, thank you, I'm sorry.  Respect your

7   elders, be a good friend, student, team player, love God, and

8   always listen for my voice.  It's my mantra.

9           The loss of Patrick at just 24 years old is beyond

10  any other sadness or pain I have ever felt in my life.  It's

11  just not supposed to happen this way.  I had to bury my

12  beautiful son Patrick, and now all the future wonders of

13  Patrick have come to an end.

14          I have watched the impact of Patrick's death on his

15  brothers and father, each struggle in their own ways, missing

16  every moment of time that was taken from them and from

17  Patrick.  One senseless, selfish, irresponsible act, Patrick

18  did not deserve what happened to him on August 30th, 2016.

19  Patrick deserved to live.

20          I thank God Patrick knew how much I loved him, and I

21  thank God that this mama knew how much he loved her.  I will

22  live each day of my life honoring the life that Patrick

23  cannot.

24          THE COURT:  Ms. Mercer, thank you for your

25  courageous testimony.  You may be seated.  Thank you.  And I

1   apologize for the outburst that interrupted your testimony.

2          MR. ALFORD:  Thank you, Judge.  And again, Jackie

3   Mercer's son is just going to help her, if that's okay with

4   the Court.

5          THE COURT:  While we're doing that, we are -- I am

6   -- I am revoking the defendant's right to appear -- to proceed

7   pro se.  He clearly can't condone himself -- or conform his

8   behavior to what's necessary to be in court.  After the next

9   victim witness testifies, we will attempt to bring him in

10  again.  We'll give it another shot.  But he will not be

11  representing himself.  I will be looking to you,

12  Mr. Truesdale.  And I apologize to put you in this position,

13  but I think that's what the law requires at this time, sir.

14         Please have a seat.  And do you need a water?

15         MR. MERCER:  Please.

16         THE COURT:  Yeah.

17         MR. MERCER:  Thank you.

18         THE COURT:  And we'll let Ms. Mercer have a seat.  I

19  note she's on crutches today.  So we're going to give her a

20  little time to get comfortable.  Sir, would you please begin

21  by speaking your full name and spelling your last name for our

22  record?

23         MR. MERCER:  Michael Kelly Mercer, M-E-R-C-E-R.

24         THE COURT:  Mr. Mercer -- I'm sorry.  Mr. Alford,

25  please proceed.

1          MR. ALFORD:  Yes.

2          Mr. Mercer, you are the brother of Patrick Mercer;

3   is that right?

4          MR. MERCER:  I am, yes.

5          MR. ALFORD:  And he passed away in the car wreck

6   that was caused by the defendant on August 30th, 2016; is that

7   right?

8          MR. MERCER:  Yes.

9          MR. ALFORD:  And prior to testifying today is it

10  fair to say that you and I conferred and you indicated that

11  you have an interest in making a statement to the Court?

12         MR. MERCER:  Yes.

13         MR. ALFORD:  And is it fair to say you've prepared

14  one?

15         MR. MERCER:  Yes.

16         MR. ALFORD:  And if you wouldn't mind, go ahead, and

17  I think the Court will ask you just read slowly so that we can

18  make sure that the court reporter gets everything.  And you're

19  free to make your statement.

20         THE COURT:  Thank you, Mr. Alford.

21         Mr. Mercer, please proceed, sir.

22         MR. MERCER:  My name is Kelly Mercer.  And I am here

23  today on behalf of my family with a monumental if not

24  impossible task to express in words how the loss of my little

25  brother, Patrick, has impacted me and my family.  Now I know

1    from the outset that I will fail at this task because there is

2    no combination of words in any conceivable order that will

3    ever fully articulate the love so many had for Patrick, the

4    limited potential of the life laid before him, or the visceral

5    thing of hurt that we feel every day he isn't with us.

6         I say impossible task, because unless you've held

7    your little brother in your arms as he takes his last breaths

8    on the side of a road, you wouldn't understand the impact.

9    The memory and pain that come along with that night will be

10   with me until my last days.  They live as a part of me now,

11   and their vividness, unfortunately, doesn't dissipate with

12   time.

13        I say impossible because unless you've watched your

14   own mother and father cry over your brother's body at a

15   funeral home and kiss his cold forehead and hold his cold

16   hands you'd know that words don't adequately express that kind

17   of anguish and helplessness.  I say impossible, because some

18   of the pain isn't even known yet.  Just anticipated.

19        My sorrow and pain become anger when I think about

20   what should have been for Patrick.  He had just graduated from

21   Pittsburgh State and had become a -- begun a promising career

22   in construction management.  Of my mother's three boys, he was

23   definitely the most responsible and mature beyond his years.

24   More importantly, though, he was kind, and he was loving,

25   Patrick was the type of man that ensured everyone else's needs

were taken care of before he even looked to his own. He

sacrificed for our family during tough times, and inspired me

to be better just by doing what came most naturally to him, by

being at his core a good and compassionate person.

He would have made an incredible husband and an even

better father. My youngest brother, Jack, said it best when

he said that what will hurt the most is when Patrick and his

wife and children aren't there for our family's holidays, our

Sunday dinners, the football games, the baseball tournaments

and so on.

Thinking about him not being there standing up with

me as with one of my best men at my wedding in January were

down the road not being -- or down the road not being one of

my future children's two favorite uncles, that impact isn't

quantifiable yet. But nevertheless, it is still real, and it

is still difficult to fathom.

I can say impossible because unless you were there

to see the more than 1,000 people who came to grieve with me

and my family and to celebrate Patrick's life at his memorial,

then you can't grasp the extent of losing him. Not only on me

and my family, but on the countless lives Patrick had touched

in one way or another.

I don't know how to end this statement because the

hard truth is I never thought this was reality I would need to

confront. I shouldn't be up here talking about who my little

1  brother was.  I don't want to be up here talking about who he

2  was.  Patrick should be here.  My mom shouldn't have cried

3  herself to sleep for months over losing her son.  My family

4  should not have gone through this, and I wouldn't wish the

5  pain my family and I have endured and still feel on anyone.

6  But we are here today, and we have tried desperately to let go

7  of our anger.  We have focused on each other and on Patrick,

8  and we carry him with us every day in our hearts.

9          THE COURT:  Thank you, Mr. Mercer, for your

10 testimony.

11         MR. MERCER:  Thank you.

12         THE COURT:  You may be seated, sir.

13         All right.  Are there any other victim statements?

14         MR. ALFORD:  No victim statements, Your Honor.  But

15 as far as evidence, the government has marked as exhibits

16 Government's Exhibit 4 and 5.

17         THE COURT:  The reason I'm asking is, I'm going --

18 out of respect for his family, I didn't want to bring

19 Mr. Carnes back in if someone else from his family is going to

20 testify.  But if we're done with that part, I will bring --

21         MR. ALFORD:  We are, Judge.

22         THE COURT:  Let's try this again.  Mr. Truesdale,

23 let's put that microphone in front of Mr. Carnes.  And can

24 could we ask you to use this microphone here at the podium if

25 necessary?

1          MR. TRUESDALE:  Yes, sir.

2          THE COURT:  And if you -- if you're just going to

3    answer maybe one word responses to anything, you can just

4    stand and speak, and as long as our court reporter can hear.

5          MR. TRUESDALE:  Sure.  Yes, sir.

6          THE COURT:  Get those down.  Thank you.

7          Mr. Truesdale, there's a microphone behind you too,

8    sir.  You could pull that if that -- whatever you choose, a

9    better way, that's up to you.

10         (Defendant present.)

11         THE COURT:  Mr. Carnes, at this time I have revoked

12   your right to proceed pro se, and I have appointed standby

13   counsel to represent you.  I will give you this last warning,

14   if you -- if we hear another outburst from you or you can't

15   follow the rules, the next time we take you into the holding

16   cell will be the last time for the purposes of this sentencing

17   hearing.  So can you commit to me that you will conform your

18   behavior to what's expected of you here in this courtroom and

19   follow our rules, sir?

20         THE DEFENDANT:  Yes, sir, Judge Kays.  And I'd like

21   to say, man, like --

22         THE COURT:  No, no, no, no.

23         THE DEFENDANT:  I want to be -- I want to be -- I

24   want this to be fair, you know what I'm saying?

25         THE COURT:  I want you to stop talking.  I just

1    wanted -- that was a yes or no question.

2                THE DEFENDANT:  Yes, sir.

3                THE COURT:  You're going to be able to conduct

4    yourself appropriately.  I hope so.  The next time the

5    marshals take you out will be the last time they take you out

6    today.  Just be warned about that.  I will be looking to

7    Mr. Truesdale for his legal expertise in this case from this

8    point forward.

9                Please proceed, Mr. Alford.

10               MR. ALFORD:  With respect to evidence, Judge, the

11   government has marked Government Exhibits 4 and 5, which are

12   written statements, impact statements from Kelly Mercer and

13   Jackie Mercer.  They're substantially consistent with what

14   they just told the Court, but just for purposes of the record

15   I'd like to offer them to be admitted.

16               THE COURT:  Mr. Truesdale?

17               MR. TRUESDALE:  No objection, Your Honor.

18               THE COURT:  Thank you.  Exhibits 4 and 5 are

19   admitted.

20          (Government Exhibits 4-5 admitted in evidence.)

21               MR. ALFORD:  No additional evidence, Judge.

22               THE COURT:  Okay.  Mr. Truesdale, does the defendant

23   have evidence that he wishes to present at this time?

24               THE DEFENDANT:  So what is like the strategy next?

25               THE COURT:  Let's go off the record briefly, so...

1     (Discussion off the record.)

2          THE COURT:  We're back on the record.  I heard some

3     of the things that Mr. -- that the defendant was saying about

4     the racially motivated prosecution, and all these other

5     things, which are not really appropriate for a sentencing

6     hearing, which I'm sure he'll be able to express in his motion

7     -- or in his appeal -- in the appeal process.

8          But I'll remind you, Mr. Carnes, that

9     Mr. Truesdale's job is not to voice everything you come up

10    with as far as an objection.  His voice as an officer of this

11    Court is only -- his job is as an officer of the court only to

12    advance legal theories which have merit, and he is first bound

13    as an officer of the Court to follow those rules.  So he may

14    not be able to entertain all of your ideas about how you

15    believe a sentencing hearing should be conducted.

16         Mr. Truesdale, is there any evidence the -- that's

17    appropriate that the defendant wishes to present at this time?

18         MR. TRUESDALE:  Your Honor, in my professional

19    opinion nothing has been presented to me that would be

20    appropriate to address to the Court.

21         THE COURT:  Very good.  Thank you.  All right.  So

22    next we will go to -- I think the next step is argument.  And

23    I have reviewed the government's sentencing memorandum and

24    request for variance, document 124.  Mr. Alford, would you

25    like to proceed?

1          MR. ALFORD:  Yes, Your Honor.  The United States is

2   recommending the statutory maximum sentence based off of what

3   I believe the stat max is in this case, Judge.  As I mentioned

4   it previously in this hearing, I believe Counts 1 and 2 merge

5   for sentencing.  If they didn't I'd be asking for more time.

6   But they -- they do, I believe, and as an officer of the court

7   I have a duty to tell the Court that.

8          So the United States is recommending that the Court

9   adjudge 120 months of imprisonment on Counts 1 and 2, three

10   years of supervised release, $100 mandatory special

11   assessment, restitution to the victim, Terrence Walls, in the

12   total of $3,833.78, which I'll have some more to say about

13   that in a moment, Judge.  And with respect to the Count 3 the

14   United States is recommending 120 months of imprisonment to

15   run consecutive to Counts 1 and 2, and three years supervised

16   release, and a $100 mandatory special assessment, for a total

17   of 240 months imprisonment, three years supervised release,

18   and $200 mandatory special assessment.

19          With respect to restitution, Judge, the figure of

20   $3,833.78 is based off of the declaration that Terrence Walls

21   provided, which is marked as Government Exhibit 2.  The PSR

22   had an amount recommended of $3,315.78.  The discrepancy in

23   the two figures is based off of Terrence Walls' assertion that

24   he had window repair in the amount of $518.10.  He has not

25   been able to provide any documentation of that.  Having said

1    that, based on common sense, I don't think that that's an

2    outrageous claim.

3          And the United States presented evidence at trial,

4    that the Court might recall, not only testimonial evidence

5    from Terrence Walls, but also Government Exhibit 29, which

6    showed a photograph of Terrence Walls' vehicle -- actually a

7    couple photographs, which clearly depicted that his windshield

8    was destroyed with bullet holes in addition to the bullet

9    holds in his vehicle.  So based off of Terrence Walls'

10   estimate and common sense and the other evidence presented at

11   trial, the United States believes his assertion of $3,833.78

12   is appropriate, and it meets the preponderance of the evidence

13   standard.  In the event the Court doesn't feel like it does,

14   then the United States would ask for the fallback position

15   that doesn't give credit for the window.

16         The Court also has to make a finding on the

17   restitution issue, to order it, that in addition to the

18   defendant causing that damage, that also he has the ability to

19   pay.  So with respect to that issue, the United States would

20   point that -- out to a couple things.  One, the defendant is

21   very young, and the monetary penalties unit can seek this

22   money for a couple decades.  Moreover, it's my understanding

23   that the Bureau of Prisons has work programs where the

24   defendant can work and get up to $25 a month, and if he

25   doesn't do it he'll lose privileges.  Well, even though it

1  will be difficult to get that money in restitution, that's

2  something that the monetary penalties unit can seek, and

3  frankly it's probably a good restitution -- I mean, a good

4  rehabilitation for this defendant, start paying back the

5  victim.  So we would like the Court to make that finding that

6  he is abilable -- able to pay restitution, and that that

7  amount is appropriate.

8          With respect to the sentencing factors that justify

9  the maximum sentence in this case, first I'd like to just

10  point to the -- in this case I think the most important

11  3553(a) factor, which is the nature of the offense.

12          Jackie and Kelly Mercer probably -- not probably,

13  definitely can tell the Court and they did tell the Court how

14  this defendant's reckless actions has caused a tremendous

15  heartbreak for them, and they did a better job than I could

16  ever hope to do.  But I have to mention it because it's so

17  impactful, and that in itself, Judge, I think could warrant a

18  20-year sentence.  But I think that the devil's advocate might

19  say, well, okay, the defendant was on PCP, cocaine and

20  marijuana, and he was in a gunfight, but that's just reckless.

21  He didn't maybe intend to kill Patrick Mercer.  And that might

22  have some merit to it.  But then we look at the facts of this

23  case, and we look at, well, he sure intended to shoot at

24  Terrence Walls.  He shot right at him.  And he shot his car

25  up, and that was with the intent to hurt Terrence Walls.  And

1   that's the same firearm that he had found on him on August

2   30th of 2016, he used to shoot at Terrence Walls. That shows

3   you his intent.

4         Moreover, if you look at this particular defendant

5   while he's been in custody, it's pretty common for defendants

6   that when they have something heavy like this hanging over

7   their head that they actually mind their Ps and Qs, and they

8   engage in things to show that they have the --

9         THE COURT: Hold on, Mr. Carnes. Stop it. Sit

10   still and listen.

11         THE DEFENDANT: I'm listening.

12         THE COURT: And don't get up again. If you get up

13   again the marshals are directed to take you out of the

14   courtroom.

15         Please proceed, Mr. Alford.

16         MR. ALFORD: This particular defendant rather than

17   engaging in some of the rehabilitative programs that are

18   available to him, what does he do? He assaults a correction

19   officer, and it's pretty clear he attacked her. He's a

20   predator, Judge. He attacked her, he went after her throat.

21   It was so egregious that another detainee intervened on her

22   behalf.

23         We also -- I would like to refer the Court to his

24   testimony at trial, because that's also relevant for the

25   nature of the conduct. The United States could have asked for

1    an obstruction of justice enhancement under the guidelines.

2    And basically the main reason why I didn't was because, he did

3    admit to most of the elements of the offense.  So parts of his

4    testimony were truthful.  But he lied when he said he wrestled

5    the firearm in question from his assailant.  How do we know

6    that?  Because he used it against Terrence Walls.  And that

7    factor of his perjured testimony is certainly something the

8    Court can consider when whether or not an upward variance is

9    appropriate.

10            I would also like to point out that in Count 3 the

11    incident where he was using marijuana and had a firearm,

12    that's pretty dangerous too.  He was driving around high on

13    marijuana with a firearm.  He's a -- he's a total danger to

14    the community, which the facts of this case demonstrate.  But

15    it's not just the facts of this case, it's the criminal

16    history of this defendant.  He's in criminal history category

17    IV, which certainly isn't the worst but it's certainly not

18    good considering his young age.  He's also got a prior

19    aggravated assault with a firearm, which is identified in PSR

20    paragraph 32, where he shot two victims.  And I'd like to note

21    that the circumstances of that case were pretty similar to his

22    shooting incident against Terrence Walls, which shows that his

23    punishment that he got back for that case did nothing to deter

24    him from the same type of criminal behavior that he's here

25    before this Court.

1          With respect to the defendant's mental history.  The

2    defendant made some statement earlier in these hearings about

3    how, well, this correction officer, it's his fault he had to

4    strangle her because she wasn't responsive to his needs for a

5    mental evaluation.  I'd like to just point out this Court had

6    a mental evaluation of this defendant, and that mental

7    evaluator opined that he was a malingerer, which that too is a

8    factor I think that the Court should consider in determining

9    the total history in considering the 3553(a) factors.

10          I think that the Court can also consider the

11    defendant's actions throughout these proceedings.  I think

12    they're indicative of his lack of rehabilitative potential.

13    There's little hope that this defendant has rehabilitative

14    potential.  He showed that -- he's shown time and time again

15    he's a predator.  He's shown time and time again he's a danger

16    to the community.  And sadly, the only thing we can do is try

17    to separate him from the community as long as possible.

18          Finally, just the other 3553(a) factors that I won't

19    belabor, but certainly this type of sentence the maximum

20    sentence will provide specific deterrence that his prior

21    punishments have not provided.  It will provide general

22    deterrence, and hopefully it will provide promotion for

23    respect for the law.  And for all those reasons that's why

24    we're making the recommendation, Judge.

25          THE COURT:  Thank you, Mr. Alford.

1        Mr. Truesdale, could we ask you to come to the

2   podium?  I think --

3        MR. TRUESDALE:  Yes, Your Honor.

4        THE COURT:  I think it's hard for you to do your job

5   given the defendant's behavior.

6        MR. TRUESDALE:  One moment, sir.

7      (Defendant conferred with counsel off the record.)

8        THE COURT:  No.  I hear you say, "Can I speak?"

9   You'll be -- you'll get a chance to speak at the very end

10  before I pronounce sentence.

11       THE DEFENDANT:  Okay.

12       THE COURT:  Right now you are not to speak, you are

13  to be quiet.  I'm going to let Mr. Truesdale make a

14  recommendation to the Court.

15       THE DEFENDANT:  Can he talk to me and explain to me?

16       THE COURT:  No, no.  We are having a hearing.

17       THE DEFENDANT:  I don't know what he's going up

18  there to say.

19       THE COURT:  Stop talking.  Thank you, Mr. Carnes.

20       Thank you, Mr. Truesdale.

21       MR. TRUESDALE:  May it please the Court?

22       THE COURT:  Yes, sir.

23       MR. TRUESDALE:  Your Honor, I'd like to make a

24  record for myself.

25       THE COURT:  Yes, sir.

1          MR. TRUESDALE:  On June 2nd was the last attempt I

2    made after multiple --

3          THE COURT:  Could you get closer to that microphone?

4          MR. TRUESDALE:  I beg your pardon.  On June 2nd --

5          THE COURT:  Is that microphone on?  Okay.  Okay.  It

6    is.  I'm sorry.

7          MR. TRUESDALE:  I'm sorry.

8          THE COURT:  It's tough.

9          MR. TRUESDALE:  I'll do better to project.  On June

10   2nd was the last attempt I made at communicating directly with

11   my client, Mr. Keith Carnes.  I received an email directed to

12   me that he did not want to respond or see me or be involved

13   with me.  That was after multiple efforts where I was

14   attempting to contact him to discuss his presentencing

15   investigation report.

16         Now with respect to today's proceedings, Your Honor,

17   I believe that we would ask the Court, reasonably, with

18   respect to the restitution owed to Mr. Walls, I understand the

19   standard, preponderance of the evidence, but at this point I

20   don't believe the government has provided the Court with any

21   documentation with respect to those expenses.  We would ask

22   the Court to take that into consideration with respect to

23   Mr. Carnes' objection.

24         And with respect to his sentencing, Your Honor,

25   there is a presentencing investigation report, with a

1    guideline range of 77 to 96 months, and we would ask the Court

2    to -- to consider that range of punishment rather than the

3    upward variance.  Thank you, Your Honor.

4              THE COURT:  All right.  Thank you.

5              Okay.  Mr. Carnes, now is your time to speak if you

6    wish to speak.  You don't have to speak, but we're going to

7    let you sit right where you're at and the marshals are helping

8    us with a microphone.

9              THE DEFENDANT:  Okay.

10             THE COURT:  And now is -- you know, I just ask that

11   you be respectful.  And what is it you'd like to say,

12   Mr. Carnes?

13             THE DEFENDANT:  Okay.  On the second day of trial,

14   you -- you -- Mr. Trues -- Terrence Walls got on the stand

15   first, and he said he marked 5 or 6, more 6, and he said the

16   shooter had all black handgun.  And he said that the detective

17   say, how sure are you that this is the person who shot you?

18   It's in the statements, in the line-up as evidence, if we

19   could present it that how sure is this number 6 is the person

20   that shot you?  In Terrence Walls' statements Terrence Walls

21   says, I'm not sure.  As in, I'm not sure this is Keith Carnes

22   that shot Terrence Walls.  You know what I'm saying?  And in

23   line-up number 3, my brother, Keith L. Carnes, another Keith

24   L. Carnes is in the line-up number 3.  You know what I'm

25   saying?

1          And after Terrence Walls got off the stand the

2    government called Detective David Kissee get on the stand.

3    Detective David Kissee said the government asked him what the

4    proffer said.  He asked him a question, who is the one who

5    marked 5 or 6?  The detective said he was the one who marked 5

6    or 6.  I heard it.  "Mr. Truesdale, you hear that?"  "Yes."

7    Yeah.  We heard it.  You know, what I'm saying?

8          So when Mr. Truesdale goes next, Mr. Truesdale goes

9    up there and asks and tells David Kissee to repeat what he

10   just said, to inform him that he just said that are you the

11   one that said you marked 5 or 6, and he said, yes, I'm the one

12   who marked 5 or 6.  And you stopped Mr. Truesdale.

13              THE COURT:  Stop.  Stop.

14              THE DEFENDANT:  You stopped Mr. Truesdale and he

15   said, yeah, he was wrong.  You was incorrect and you was in

16   misconduct for your actions.

17              THE COURT:  Stop.  Stop.  Here's the deal.  You're

18   telling me about your appeal, which --

19              THE DEFENDANT:  This ain't no appeal.

20              THE COURT:  Hold on.  Hold on.  I'm getting ready to

21   pronounce a sentence upon you.  Would you like to say anything

22   related to that?

23              THE DEFENDANT:  I'd like -- I would like to have

24   suppress that statement, suppress that statement.

25              THE COURT:  Okay.

1    THE DEFENDANT:  He was supposed to cross-examine --

2    he was supposed to cross-examine the witnesses again.  As a

3    lawyer, and you know this as you've been doing this for a long

4    time, Kays, you know he was supposed to cross-examine the

5    witnesses.  They was lying on the stand.  You made an error.

6    You said that Terrence Walls said Detective -- the detective

7    is the one who said 5 or 6.  Terrence Walls lied on the stand,

8    and detective, he lied on the stand.  He was obstruction of

9    justice for him to be marking anything on the line-up paper.

10   That's the witness' job to do in an investigation room.  You

11   know this, Judge Kays.

12       And it's perjury for him to tell the witness that

13   I'm the person that got caught with this gun.  It's perjury.

14   You know that.  And I was trying to get him to ask for that

15   motion.  He -- he -- he said, no, he don't want to

16   cross-examine and didn't want to suppress that statement.

17   Because if you would have suppressed that statement I was

18   going to ask at the time to -- you know what I'm saying?

19   Present all this back up, and catch him in their lies, and we

20   was going to ask at the time to dismiss all the counts from

21   this indictment due to prob -- lack of probable cause.

22       THE COURT:  Slow down.  We're trying to --

23       THE DEFENDANT:  Under Fifth Amendment.  Under due --

24   know what I'm saying?  Like, there was no probable cause, no

25   probable cause.

1          Hey, I got shot.  I got shot up, and I was rushing

2   to the hospital, and I passed out behind the wheel, Your

3   Honor.  I was -- I didn't know what happened that day.

4          Like, I was in a black dream, like the only thing I

5   was thinking about was my kids and picturing me in the casket,

6   and they crying and seeing me in the casket.  That's all I was

7   thinking about, trying to rush to this hospital.  Like my

8   mind, I was blanking out.  I never been shot.  I never been in

9   this situation.  Like, drugs is like it was not the answer.

10  Like this happened on 53rd and Park.  I grew up in this

11  neighborhood.  I'm from this neighborhood.  You know, like --

12  like -- like I got shot up and I was trying to rush to the

13  hospital, you know what I'm saying?  Like I -- I passed out

14  behind the wheel and I accidentally killed and hit them

15  people, you know what I'm saying?  Like my heart goes out to

16  them, and I'm sorry for what I caused you-all.  Like, I'm

17  sorry.  You know what I'm saying?  Like I was shot up 11

18  times.  Did you-all see the video?  Did you-all see me?  Did

19  you-all see the video?  Like you-all were looking at me, like,

20  because I'm black and I'm from the neighborhood, and I'm from

21  the streets.  I know that.  I'm from the streets and

22  neighborhood.  I grew up in the --

23          THE COURT:  Hold on.  You got to turn around and

24  talk --

25          THE DEFENDANT:  Oh, yeah.  I grew up in the black

1   community.  I walked in the field, you know what I'm saying?

2   Because I'm sorry for what I caused to you-all lost.  You know

3   what I'm saying, for what I did to you-all.  I was shot up

4   real bad.

5           THE COURT:  You got to turn around.

6           THE DEFENDANT:  I had three suspects trying to kill

7   me, you know what I'm saying?  Like --

8           THE COURT:  You got to turn around to the

9   microphone.

10          THE DEFENDANT:  Yeah.  I had three suspects.  I want

11  to look in their eyes.

12          THE COURT:  No, no.

13          THE DEFENDANT:  I want to be truthful.  I want to be

14  with them like because I had suspects like trying to kill me.

15          THE COURT:  Stop, stop.

16          THE DEFENDANT:  And like my mama they ain't never

17  seen me.

18          THE COURT:  Stop.  You got to talk in the microphone

19  because we have to write everything you say down.

20          THE DEFENDANT:  Okay.  And Judge Kays, you know,

21  like Mr. Truesdale asked you, so he was in misconduct, because

22  he did not cross-examine the witness, and he did not come back

23  here after the second day of that trial.  I told him to come

24  back and talk to me.  He quit talking to me.  He quit -- he

25  quit just working with me.  He quit -- he turned on me, you

1 know what I'm saying?  He told me, he's writing on paper,

2 you're going to get 30 years.  He told me, you're going to get

3 guilty.  The night before, you're going to get guilty.  The

4 juror on the stand -- you let a juror chew tobacco on the

5 stand and didn't take him to jail.  This is bias.

6    I mean, what's going on in here?  This is all

7 staged.  You know what I'm saying?  This dude -- this dude

8 gots a personal vendetta towards me.  He bust my mom in the

9 ear with an object.  (Indiscernible).  She had

10 (indiscernible).

11    THE COURT:  Stop it.  Stop it.

12    THE DEFENDANT:  This man -- this man harasses us

13 every day in the hood.  Every day.  He harasses and beat

14 people up and pull firearms in my face.  He --

15    THE COURT:  You got to stop talking.  I'm going to

16 let you have one minute.  Anything else -- any last words

17 you'd like to say before I pronounce sentence?

18    THE DEFENDANT:  I just like -- I'd just like to --

19 Your Honor, you was supposed to dismiss this case on the

20 second day of trial.  You was supposed to suppress that

21 statement.  You did not suppress that statement.  Without --

22 with those false accusations I would have never been charged.

23 They're saying that I shot Terrence Walls with this weapon to

24 get me charged illegally, you know what I'm saying?  They

25 would put it in my indictment until May 2019.  And he showed

1    me this.  And he showed me the video.  Let's watch the video.

2    It's in the evidence.  Let's watch the video.  Can we watch

3    the video?  It's in evidence.  Let's watch the video so you

4    can see this.  I want you to see this, the dirtiness that the

5    detective have his -- his friend lie for him.

6              THE COURT:  Okay.  You're done.  You're done.  Stop.

7              THE DEFENDANT:  Okay.  Just one more thing and it's

8    over.  One more thing and it's over, please.

9              THE COURT:  Okay.

10             THE DEFENDANT:  He got suspended from the force.

11   They never disclosed this for racial extended.

12             THE COURT:  Stop.

13             THE DEFENDANT:  Is this the same detective that say

14   eeny, meeny, miny, moe, catch a nigger by their toe?  Is this

15   the same one that's lied for them on the stand?

16             THE COURT:  We're done.

17             THE DEFENDANT:  I want to know this.

18             THE COURT:  We're done.  Stop talking.  Do you want

19   to be in here for the rest of this?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Okay.  Stop talking.  It's my turn to

22   talk.

23             This is a very sad case.  I can't imagine -- I can't

24   begin to imagine what this poor family, the Mercer family has

25   been through.  And they have shown remarkable courage, and

1  made some very powerful statements here today.  There's words

2  that were used by Ms. Mercer that I wrote down that I thought

3  were just -- they were kind, and they were appropriate.

4  Senseless, selfless -- selfish, and irresponsible.  That is

5  what this case is really about.  Senseless, selfish, and

6  irresponsible.  Someone, who for whatever reason, puts the

7  safety and well-being of everybody in this community to the

8  side and doesn't consider what actions -- what their actions

9  will potentially cause.

10  Mr. Alford used a word.  Predator.  That's really

11  the only way to describe this conduct that we've seen here.

12  We have a -- in document -- in the presentence investigation

13  report I looked at paragraph 31, where your prior convictions

14  of assault second degree, two of them, it's the -- it's the

15  Terrence Wall part of this case.  It's exactly the Terrence

16  Wall part of this case.

17  You go up to people and you shoot them in their car.

18  Except for Terrence Wall wasn't injured physically, but these

19  other people were shot numerous times.  It all makes sense,

20  Mr. Carnes, if you listen to the evidence.  And I found the

21  evidence in this case to be overwhelming.  And I'll tell you

22  another thing.

23  THE DEFENDANT:  Huh-uh.

24  THE COURT:  Jonathan Truesdale is one of the finest

25  lawyers we work with in this court system.

1          THE DEFENDANT:  Huh-uh.

2          THE COURT:  He's the third or fourth attorney you've

3     had because you have a way of going through lawyers.  Part of

4     that is gamesmanship, I understand.  Your attempt to create

5     error -- no, you can't talk right now.  Your attempt to create

6     error in this case, to create some problem with your Sixth

7     Amendment right to counsel.  It didn't work, Mr. Carnes.  You

8     failed and you're misguided.  Mr. Truesdale acted so honorably

9     in this case, and I was very proud that he works for our

10    Criminal Justice Act -- Criminal Justice Act counsel.  So

11    there's nothing he did other than try to represent you.

12          So we look at factors under 18 U.S.C. 3553(a).

13    These factors are given to us by Congress, and they should

14    inform decisions that we make in this case.  The guidelines

15    are one of the many things we look at.

16          It's clear to everybody in this court, and everybody

17    who sat on that jury, there is one factor that screams loudly,

18    the need to protect the public.

19          The need to protect good people like the Mercer

20    family from this tragic loss that they sustained.  The need to

21    protect everyone else who's trying to drive -- drive around

22    this metropolitan area in their job, in their work, in their

23    -- in what they do.  So top of that list is need to protect

24    the public.  That's what's going to drive this sentence in

25    your case.

1          The nature and circumstances of this offense.  It's

2   bad.  And get -- don't get me wrong here.  I am looking at the

3   creator of all these circumstances.  Everybody in this

4   courtroom is here because of decisions that Mr. Carnes made.

5   You brought us all here today.  You brought the jury here.

6   You brought the marshals here.  Everybody is here because of

7   your decisions, which are very sad.

8          But they're not inconsistent with your criminal

9   history that we've seen in here.  So the criminal justice, you

10  talk about many of its failings.  Maybe one of the failings is

11  not locking you up for a longer period of time earlier.  That

12  may be one of the failings of the criminal justice system that

13  I see.

14         We look at the need for deterrence, hopefully to

15  deter you, to give you some time to think about this,

16  Mr. Carnes, and give other people the understanding that there

17  are severe consequences related to this behavior.

18         Those two are the main ones.  I've considered all

19  the factors in this case, or those four are the main ones, the

20  need for deterrence, the need to protect the public, the

21  nature and circumstances of this offense, and your unique

22  history.  It's a sad day.  No one wants to be here today,

23  Mr. Carnes.  You brought us here.

24         I have considered, as I said, all the factors under

25  18 U.S.C. 3553(a).  I agree with Mr. Alford, this -- the

1   maximum sentence allowed by law is not enough.  But it's the

2   only legal sentence that we can give you.  Because this

3   conduct, this case, calls for a much longer sentence.  And I

4   hope that you get yourself together while you're serving this

5   sentence, Mr. Carnes, because you are -- you'll end up dying

6   in prison one day, no doubt at the rate you're going.

7           THE DEFENDANT:  I hope -- I hope -- I hope you quit

8   being racist and you -- and you allow black -- and you allow

9   us blacks, as you know what I'm saying, quit being biassed and

10  racist, and you slander blacks in courts, you know what I'm

11  saying?  During your trials.

12          THE COURT:  So now, Mr. Carnes, it is the judgment

13  and sentence of this Court, sir, pursuant to the Sentencing

14  Reform Act of 1984, that this defendant, Keith L. Carnes, is

15  hereby committed to the custody of the Bureau of Prisons for

16  120 months on Counts 1 and 2.  These are merged for sentencing

17  purposes.  And 120 months on Count 3, to be served

18  consecutively, for a total of 240 months.  The maximum allowed

19  by law.

20          Upon release from imprisonment the defendant shall

21  be placed on supervised release for three years, on each

22  Counts 1, 2 and 3.  These terms shall run concurrently.

23  That's the maximum allowed by law.

24          While on supervised release the defendant shall

25  comply with the mandatory and standard conditions which have

1  been adopted by this Court.  In addition, he shall also comply

2  with the special conditions listed in part D of the

3  presentence investigation report.

4          I am going to waive a fine in this case, because I

5  do expect restitution of $3,833.78 to be paid by you, and I do

6  believe you will have the ability to pay this through your

7  work in prison and when you get out of prison, hopefully.

8          Those terms of payment will be consistent with part

9  D of the presentence investigation report.  You have 14 days

10  to appeal this decision, sir.  I must tell you about that.

11          What else do we have to take up in this matter,

12  Mr. Alford?

13          MR. ALFORD:  Nothing, Your Honor.

14          THE COURT:  Mr. Truesdale, anything else on behalf

15  of Mr. Carnes, sir?

16          MR. TRUESDALE:  If I may, Your Honor?

17          THE COURT:  Yes, sir.

18          MR. TRUESDALE:  Your Honor, throughout communication

19  with Mr. Carnes it's always been very clear to me that there

20  will be an appeals process.

21          THE COURT:  Yes, sir.

22          MR. TRUESDALE:  Your Honor, I understand how

23  typically that goes with respect to the Eighth Circuit.  But

24  for the sake of how this relationship has deteriorated so

25  greatly, I would beg off with respect to being appointed in

1    this matter.  I would just like to make that record, Your

2    Honor.

3         THE COURT:  I'm going to take that under advisement

4    at this time.  I worry about the transition in his appeal from

5    appellate coun -- from you to appellate counsel.  But I

6    understand your position, that Mr. -- I understand Mr. Carnes

7    has made it clear he doesn't want to work with you or any

8    other attorney that we've ever appointed in this case.

9         MR. TRUESDALE:  Yes, sir.

10        THE COURT:  So thank you.

11        MR. TRUESDALE:  Thank you, Your Honor.

12        THE COURT:  To the extent you've -- well, let me

13   tell you, Mr. Carnes, so we're clear, you have 14 days from

14   the entry of judgment in your case to file the notice of

15   appeal.  If you do not file a notice of appeal within 14 days

16   of that date of judgment, sir, you will forever lose your

17   right to appeal.  If you cannot afford to file an appeal, you

18   can file a motion to proceed in forma pauperis.  If you so

19   request, the clerk of court shall immediately prepare and file

20   a notice of appeal on your behalf.

21        Mr. Carnes, that concludes this hearing.  Thank you

22   all for being here today on this very difficult day.

23        (Proceedings concluded at 11:10 a.m.)

24

25

1           C E R T I F I C A T E

2        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5    /s/Regina A. Lambrecht          November 2, 2020
     REGINA A. LAMBRECHT, RDR, CRR    DATE
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25